**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-1823**

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey
Corporation,

Plaintiff - Appellee,

v.

SHENZHEN STONE NETWORK INFORMATION LTD.,

Claimant - Appellant,

and

FRANK ZHANG, a citizen of China; PRU.COM, a domain name,

Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  T. S. Ellis, III, Senior District Judge.  (1:20-cv-00450-TSE-MSN)

Argued:  December 8, 2022                         Decided:  January 24, 2023

Before DIAZ and THACKER, Circuit Judges, and FLOYD, Senior Circuit Judge.

Affirmed by published opinion.  Judge Thacker wrote the opinion in which Judge Diaz and
Judge Floyd joined.

**ARGUED:**  Benjamin S. Barlow, DUNLAP BENNETT & LUDWIG, PLLC, Leesburg,
Virginia, for Appellant.  Mark Van Buren Partridge, PARTRIDGE PARTNERS, PC,

Chicago, Illinois, for Appellee. **ON BRIEF:** David C. Deal, THE LAW OFFICE OF DAVID C. DEAL, P.L.C., Crozet, Virginia; David D. Lin, Justin Mercer, LEWIS & LIN LLC, Brooklyn, New York, for Appellant. Charles G. Giger, CULHANE MEADOWS PLLC, Dallas, Texas, for Appellee.

THACKER, Circuit Judge:

Appellant Shenzhen Stone Network Information Ltd. ("SSN") appeals the district court's order granting summary judgment on Appellee Prudential Insurance Company of America's ("Prudential") cybersquatting claim.  Prudential owns several registered trademarks on the term PRU and other PRU-formative marks.  Prudential initiated the underlying action after discovering that SSN had registered the domain name PRU.COM.  Internet users who visited PRU.COM were routed to a page that included advertisements displaying Prudential's trademarks and the marks of Prudential's competitors.

Prudential alleged, inter alia, that SSN violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125, by registering a domain name identical to Prudential's distinctive mark with the bad faith intent to profit.  Although SSN was not the initial registrant of the PRU.COM domain name, the district court determined that SSN could nonetheless be held liable for cybersquatting because the ACPA is not limited to the initial registration of a domain name but encompasses subsequent re-registrations as well.  Accordingly, after considering the totality of the circumstances, the district court concluded that SSN possessed the bad faith intent to profit from the disputed domain name and granted Prudential's motion for summary judgment.  On appeal, SSN contests the district court's ruling that SSN acted in bad faith when registering the disputed domain name.

For the reasons set forth below, we conclude that the totality of the circumstances supports the conclusion that SSN acted in bad faith and that SSN is not entitled to the benefit of the ACPA's safe harbor provision.  Therefore, we affirm.

I.

SSN is a Chinese internet company that distributes financial and economic information to Chinese consumers via various online media outlets, with a focus on the foreign exchange industry ("forex"). Zhaoyuan "Frank" Zhang ("Zhang"), a citizen of China, is the CEO of SSN and is responsible for registering and managing the PRU.COM domain name on SSN's behalf.

On October 13, 2017, Zhang purchased the PRU.COM domain name at the behest of SSN through Sedo.com, an online domain name marketplace. The PRU.COM domain name was previously owned by an unidentified Texas company. Zhang claimed that SSN paid $100,000 for the domain name. GoDaddy, Inc. ("GoDaddy"), headquartered in Arizona, is the domain name registrar for PRU.COM, and VeriSign, Inc. ("VeriSign"), headquartered in Virginia, is the domain name registry.[1] When Zhang registered the domain name with GoDaddy, he signed a GoDaddy Domain Name Registration Agreement

---

[1] A domain registrar is an accredited organization, like GoDaddy, that sells domain names and provides registration services to the public. *What Is the Difference Between a Registry, Registrar and Registrant?*, GoDaddy, https://www.godaddy.com/help/what-is-the-difference-between-a-registry-registrar-and-registrant-8039 (last visited Jan. 4, 2023) (saved as ECF opinion attachment). A domain name registry is an organization that manages the administrative data for one or more top-level domain names. *Id.* For example, VeriSign manages the registration of ".com" domain names. *Id.* Registries store registration information and work with registrars to sell domain names to the public. *Id.* A domain name registrant is the person or company who registers a domain name and has the exclusive right to use the domain name for the registration period. *Id.*

("Registration Agreement"), which included a dispute resolution policy that required him to submit to jurisdiction in Arizona for various types of domain name disputes.

Prudential is a United States insurance and financial services company that operates worldwide. In November 2002, Prudential trademarked PRU and other PRU-formative marks in the United States. Prudential has registered the same marks in several other countries and territories. However, it has yet to register such marks in China because Prudential plc, an unaffiliated company, uses the PRUDENTIAL trademark in China. By agreement with Prudential plc, Prudential does not use PRU or PRU-formative trademarks in mainland China.

In March 2020, Prudential attempted to acquire the internet domain name PRU.COM but learned that an unknown party already owned the domain name. The record establishes that on or about March 18, 2020, a GoDaddy domain broker notified SSN about a request from an anonymous buyer (Prudential) to purchase the disputed domain name. An email from the broker indicates that SSN rejected the offer and informed the broker by telephone that it had received a "six figure" offer for the domain name in the past and wanted to know the buyer's location and line of business before it would quote a price. J.A. 387.[2] However, in its discovery responses, SSN stated that there had been no other offers related to PRU.COM besides those from Prudential or its agents.

On March 25, 2020, Prudential filed an administrative action with the World Intellectual Property Organization ("WIPO") pursuant to its Uniform Domain Name

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Dispute Resolution Policy ("UDRP").[3]  A UDRP proceeding is an administrative proceeding used to resolve disputes over the abusive registration and use of specific Internet domain names without filing a lawsuit in court.  Trademark owners can use the UDRP to initiate an action in order to recuperate or suppress a cybersquatted domain name.

In its UDRP complaint, Prudential submitted to the "Mutual Jurisdiction" of the principal location of the registrar, GoDaddy.  J.A. 132.  Through the administrative action, Prudential learned that Zhang registered PRU.COM and the registrant organization was "Bailun," another Chinese company owned and controlled by Zhang.  *Id.* at 50.  On March 30, 2020, WIPO locked the PRU.COM domain name such that it could not be edited or revised pending the outcome of the UDRP proceeding.  Shortly thereafter, on or around April 9, 2020, Prudential offered to purchase the domain name for $50,000.  SSN, via Zhang, rejected the offer.

Explaining why it rejected the offer, SSN claimed it planned to develop the PRU.COM domain name into a website or product covering foreign exchange and economic news.  The parties agree, however, that SSN never uploaded any viewable content or material to the PRU.COM website.  The parties also agree that since SSN's

---

[3] WIPO is a specialized agency of the United Nations that was created to promote and protect intellectual property worldwide.  *Inside WIPO*, WIPO, https://www.wipo.int/about-wipo/en/ (last visited Jan. 4, 2023) (saved as ECF opinion attachment).  The WIPO Arbitration and Mediation Center provides several mechanisms to resolve internet domain name disputes without judicial litigation, including the UDRP program.  *Domain Name Dispute Resolution*, WIPO, https://www.wipo.int/amc/en/domains/ (last visited Jan. 4, 2023) (saved as ECF opinion attachment).

acquisition of the PRU.COM domain name, any internet user who visited PRU.COM was directed to a GoDaddy parked page.[4]  Specifically, an internet user in the United States who visited PRU.COM between October 2017 (when Zhang purchased the domain name) and March 2020 (when Prudential filed its UDRP complaint) saw a page that included (1) pay-per-click hyperlinks displaying Prudential's marks and the marks of other United States insurance companies; and (2) the phrase "Would you like to buy this domain?"  J.A. 166.

On May 7, 2020, the WIPO proceedings were terminated upon Prudential's motion. Instead, on April 22, 2020, Prudential initiated the underlying action against Zhang and the PRU.COM domain name in the Eastern District of Virginia.  Prudential alleged that Zhang violated the ACPA by purchasing the domain name to prepare for launching the website to provide forex-related services.  Prudential also alleged that Zhang's purchase and intentional use of the domain name constituted trademark infringement pursuant to the Lanham Act, 15 U.S.C. § 1114.

Zhang, individually and on behalf of the subject res (i.e., the PRU.COM domain name), moved to dismiss the action or transfer it to the District of Arizona for lack of

---

[4] When a domain name is registered with GoDaddy, it appears as a GoDaddy parked page until the registrant uploads other content.  Geoff Scott, *What is Domain Parking and How Can It Make You Money?*, GoDaddy: Blog (Dec. 16, 2019), https://www.godaddy.com/garage/what-is-domain-parking/ (saved as ECF opinion attachment).  Parked websites are completely non-functioning except as landing pages for advertisements.  *Id.*  The owner of a parked page may make money based on how many users visit the site and click on the advertisements.  *Id.*  Zhang claimed SSN was unaware that the United States version of the website displayed hyperlinked advertisements for Prudential competitors.  Zhang also insisted that SSN made no money from the United States version of the GoDaddy Parked Page.

personal jurisdiction over Zhang and an improper exercise of in rem jurisdiction over the res.[5]  Pursuant to the ACPA, a trademark owner may only proceed in rem against a domain name if the mark owner cannot locate or establish personal jurisdiction over the current domain name holder.  15 U.S.C. § 1125(d)(2)(A).  Accordingly, Zhang argued that Prudential could establish personal jurisdiction over Zhang in the District of Arizona based on Zhang's agreement with the domain registrar GoDaddy and Prudential's UDRP stipulations.  The district court dismissed Zhang as a defendant for want of personal jurisdiction but permitted this action to proceed in rem against the PRU.COM domain name.

Prudential subsequently filed a motion for summary judgment, seeking transfer of the PRU.COM domain name from SSN to Prudential.  SSN filed a cross motion for summary judgment, seeking dismissal of this action in its entirety.  The district court granted summary judgment to Prudential on its cybersquatting claim, ordered SSN to transfer PRU.COM to Prudential, and dismissed Prudential's trademark infringement claim as moot.

SSN timely appealed.[6]

---

[5] In rem jurisdiction describes the power a court may exercise over property that is the subject of a legal action. *See generally Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 224 (4th Cir. 2002).

[6] SSN and Zhang filed separate notices of appeal, and the appeals were consolidated. After the parties filed their joint opening brief, we granted Prudential's motion to dismiss Zhang from this appeal for lack of standing.  Prudential then filed a motion to strike all portions of the joint opening brief relating to the district court's exercise of in rem jurisdiction, arguing that SSN did not raise any objection to the exercise of in rem (Continued)

II.

We review a district court's grant of summary judgment and questions of statutory interpretation de novo.  *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022) (summary judgment); *Snyder's-Lance, Inc. v. Frito-Lay N. Am., Inc.*, 991 F.3d 512, 516 (4th Cir. 2021) (statutory interpretation).

III.

A.

The Purpose of the ACPA

With the rise of the Internet came new ways in which intellectual property rights can be infringed upon, and chief among them is cybersquatting.  Cybersquatting refers to the registration, use, or sale of domain names in bad faith.  The ACPA was designed to prevent cybersquatters from registering Internet domain names containing trademarks for the purpose of selling the domain name back to the trademark owner or a third party.  *See* Tamara Kurtzman, *Cyber Center: The Continued Hijacking and Ransoming of the Domain Name System by Modern-Day Corporate Privateers*, Bus. L. Today, June 20, 2016, https://www.americanbar.org/groups/business_law/publications/blt/2016/06/cyber_center _kurtzman/ (saved as ECF opinion attachment).

---

jurisdiction below as it was not a party to the case at the time the district court ruled on Zhang's motion to dismiss.  We have considered the parties' submissions relative to the motion to strike and conclude that SSN preserved the jurisdictional issue for appeal by raising it in its answer.  Therefore, we deny Prudential's motion to strike.

B.

<u>ACPA Jurisdiction</u>

The ACPA creates two distinct avenues by which trademark owners may challenge the misuse of a domain name. First, a trademark owner can challenge the misuse of a domain name by bringing an in personam action against a "suitable defendant" who registers, traffics in, or uses a domain name "identical or confusingly similar to or dilutive of" a distinctive or famous mark with the "bad faith intent to profit." 15 U.S.C. § 1125(d)(1)(A)(i)–(ii). Per the ACPA, a "suitable defendant" is a person over whom the court has in personam jurisdiction. *Id.* § 1125(d)(1)(A). If the mark owner cannot establish personal jurisdiction over the current holder or cannot locate the current holder, the mark owner may file an in rem action against a domain name registered with the Patent and Trademark Office that infringes or dilutes a similar mark. *Id.* § 1125(d)(2)(A).

Here, SSN challenges the district court's exercise of in rem jurisdiction over the domain name and argues that the district court erred in determining that in personam jurisdiction over a suitable defendant must exist at the time an ACPA complaint is filed. We address each in turn.

1.

<u>In Rem Jurisdiction</u>

SSN argues that Zhang was a suitable defendant under the ACPA because Zhang was the listed registrant of PRU.COM, Zhang submitted to personal jurisdiction in Arizona when he signed the GoDaddy's Registration Agreement, and both Zhang and Prudential

10

submitted to the mutual jurisdiction of Arizona during the WIPO proceedings. We address each argument in turn.

First, the district court properly had in rem jurisdiction over the defendant domain name because Zhang, the listed registrant of PRU.COM, was not a suitable defendant under the ACPA. The record is clear that Zhang, in his individual capacity, was not the actual registrant of the disputed domain name. Both Zhang and SSN repeatedly claimed throughout this litigation that SSN owned PRU.COM. For example, in its discovery responses, SSN stated, "[SSN] owns the domain name pru.com. Zhang Zhaoyuan a/k/a 'Frank Zhang' is aware of [SSN]'s ownership therein, insofar as he was entrusted to register and manage the domain name pru.com for [SSN]'s use." J.A. 314–15. Zhang also admits in his sworn declaration that as the CEO of SSN, he was "entrusted . . .to register and manage" PRU.COM on SSN's behalf. *Id.* at 830. Moreover, during the hearing on Zhang's motion to dismiss, his counsel represented that Zhang registered the domain name at the behest of his employer, SSN. Notably, Zhang was also dismissed from the suit *at his own request*. Corporate officers like Zhang generally lack standing to defend their corporation's property interests. *See Smith Setzer & Sons, Inc. v. S.C. Procurement Rev. Panel*, 20 F.3d 1311, 1316–17 (4th Cir. 1994). Therefore, the district court did not err by finding that Zhang, in his individual capacity, was not a proper defendant in this action.

Further, SSN's claim that Zhang was required to submit to personal jurisdiction in Arizona when he registered the domain name is without merit. GoDaddy's Registration Agreement does not require the registrant to submit to jurisdiction in Arizona for *all* legal disputes. Instead, it allows the registrant to challenge an adverse UDRP decision in the

location of the registrar (i.e., Arizona) if the dispute is brought pursuant to GoDaddy's mandatory administrative proceedings provision.[7]  But an ACPA claim is wholly separate from any administrative proceedings contemplated by the Registration Agreement.[8]

Similarly, the mutual jurisdiction provision of the UDRP complaint relates solely to the registrant's challenge of an adverse UDRP decision.  It does not require the registrant to submit to personal jurisdiction until the registrant decides to challenge an adverse UDRP decision and is only effective in the event of an adverse UDRP decision.  There has been no adverse UDRP decision here because Prudential voluntarily terminated the WIPO proceedings.  Thus, the provisions relied upon by Zhang and SSN do not constitute consent to personal jurisdiction in Arizona in connection with this ACPA case.

Notably, Zhang, initially appearing in his individual capacity, did consent to personal jurisdiction in Arizona in his May 28, 2020 declaration -- over a month after

---

[7] GoDaddy's Registration Agreement requires the registrant to submit to "the jurisdiction of the courts (1) of your domicile, (2) where registrar is located, or (3) where the registry operator is located." J.A. 181.  Thus, even if we were to determine that Zhang submitted to personal jurisdiction on behalf of SSN when he registered the domain name, it follows that the district court had personal jurisdiction over SSN since the registry operator, Verisign, is located in Virginia.

[8] "[D]omain names are issued pursuant to contractual arrangements under which the registrant agrees to a dispute resolution process, the UDRP, designed to resolve a large number of disputes involving domain names, but this process is not intended to interfere with or modify any 'independent resolution' by a court of competent jurisdiction.  Moreover, the UDRP makes no effort at unifying the law of trademarks among the nations served by the Internet.  Rather, it forms part of a contractual policy developed by [the Internet Corporation for Assigned Names and Numbers] for use by registrars in administering the issuance and transfer of domain names.  Indeed, it explicitly anticipates that judicial proceedings will continue under various nations' laws applicable to the parties." *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona,* 330 F.3d 617, 625 (4th Cir. 2003).

Prudential filed suit in federal court in Virginia. However, SSN has appeared in this lawsuit only on behalf of the subject res and has not expressly consented to personal jurisdiction anywhere in the United States. And nothing in the record to suggests that Prudential could have obtained personal jurisdiction in the United States over SSN, a Chinese company that operates almost exclusively in China. Therefore, because in personam jurisdiction could not be established over a suitable defendant, Prudential satisfied the requirements to proceed in rem in the Eastern District of Virginia because Verisign, the domain name registry, is located there. *See* 15 U.S.C. § 1125(d)(2)(A) ("The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the . . . domain name registry . . . is located.").

2.

In Personam Jurisdiction Must Exist at the Time of Filing

The ACPA provides that a trademark owner "may *file*" an in rem action in the jurisdiction where the domain name registry is located if the court finds the owner cannot obtain in personam jurisdiction over a suitable defendant. *See* 15 U.S.C. § 1125(d)(2)(ii) (emphasis supplied). In enacting the in rem provision of the ACPA, Congress recognized, "In an effort to avoid being held accountable for their infringement or dilution of famous trademarks, cyberpirates often have registered domain names under fictitious names and addresses or have used offshore addresses or companies to register domain names." H.R. Rep. No. 106-464, at 114 (1999).

We have previously held that "not all of the conditions that create in rem jurisdiction must persist throughout the life of the case." *Porsche Cars N. Am., Inc. v. Porsche.net*,

13

302 F.3d 248, 256 (4th Cir. 2002). In the federal diversity jurisdiction context, it is well settled that a court determines the existence of diversity jurisdiction "at the time the action is filed." *Freeport McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991). Thus, it follows that whether an ACPA plaintiff can obtain personal jurisdiction over a suitable defendant should also be determined at the time of filing. As the district court reasoned, "to conclude otherwise would allow any foreign defendant to choose their desired forum for litigation after being sued in an ACPA action." *Prudential Ins. Co. of Am. v. PRU.COM*, No. 1:20-cv-450, 2020 WL 4208447, at *4 (E.D. Va. July 22, 2020). Foreign-based domain name registrants with no ties to the United States would be able to manipulate ACPA proceedings by simply consenting to personal jurisdiction in a forum of their choice after the action is initiated. Accordingly, we hold that the district court did not err in determining that the relevant time for considering an ACPA plaintiff's ability to obtain personal jurisdiction over the would-be defendant is at the time of filing.

C.

The Meaning of "Registration"

Pursuant to the ACPA, a cybersquatter who "registers" a domain identical or confusingly similar to a distinctive trademark or famous mark with a "bad faith intent to profit" from the domain is liable to the trademark owner. 15 U.S.C. § 1125(d)(1)(A). However, the statute does not define the term "registers." *Id.* SSN argues that there can be no ACPA cybersquatting liability where the initial domain name registration is done in good faith. Specifically, SSN contends that its re-registration of the PRU.COM domain name in 2017 is not a qualifying "registration" within the meaning of the ACPA because

14

an unaffiliated Texas company initially registered the PRU.COM domain name before Prudential trademarked the term PRU in the United States.

This is an issue of first impression for our court. Several of our sister circuits, the Third, Ninth, and Eleventh Circuits, have considered the issue and split on the meaning of the term "registers" and its derivatives.

In *Schmidheiny v. Weber*, the Third Circuit held that the term "registration" is not limited to the initial registration but encompasses subsequent re-registrations as well. 319 F.3d 581, 582 (3d Cir. 2003). There, Stephan Schmidheiny, one of the wealthiest individuals in the world, sued Steven Weber for registering the domain name "schmidheiny.com." *Id.* at 581. Weber first registered schmidheiny.com with Network Solutions under the name Weber Net in 1999, prior to the enactment of the ACPA. *Id.* In June 2000, after the ACPA was enacted, the domain name was transferred from Network Solutions to a new registrar, Internet Names Worldwide. *Id.* at 583. The named registrant was also changed from Weber Net to Famology.com, of which Weber was the President. *Id.* The Third Circuit reasoned that if the ACPA were limited to initial registrations, it would permit "the domain names of living persons to be sold and purchased without the living persons' consent, ad infinitum, so long as the name was first registered before the effective date of the [ACPA]." *Id.* Thus, the Third Circuit held that the term "registration," as used in the ACPA, includes the initial registration and subsequent re-registrations because a "registration" is the creation of a "new contract at a different registrar and to a different registrant." *Id.*

15

The Eleventh Circuit followed suit in *Jysk Bed'N Linen v. Dutta-Roy*, holding that the term "registration" in the ACPA was not limited to the initial registration. 810 F.3d 767, 777 (11th Cir. 2015). There, the plaintiff contracted with the defendant to create an online shopping website for the plaintiff's home furniture products. *Id.* at 771. When the defendant registered the domain name "bydesignfurniture.com," he was instructed to list the plaintiff as the owner, but the defendant listed himself instead. *Id.* at 771–72. Several years later, when the registration expired, the plaintiff discovered that it did not own the registration and again asked the defendant to register bydesignfurniture.com in the plaintiff's name. *Id.* The defendant refused and re-registered the domain name and other similar domain names in his own name. *Id.*

Because the ACPA did not qualify the term "registration" with a word like "initial" or "creation," the Eleventh Circuit applied the "plain and unambiguous" meaning of the word and reasoned, "a re-registration is, by definition, a registration." *Id.* at 777 (internal quotation marks omitted). The Eleventh Circuit also looked to Congress's intent in enacting the ACPA and determined, "It would be nonsensical to exempt the bad-faith re-registration of a domain name simply because the bad-faith behavior occurred during a subsequent registration." *Id.* at 778. Therefore, the court held that a re-registration constituted a registration pursuant to the ACPA. *Id.* at 774.

But the Ninth Circuit reached the opposite conclusion in *GoPets Ltd. v. Hise*, holding that the re-registration of an existing domain name is not the type of "registration" contemplated by the ACPA. 657 F.3d 1024, 1026 (9th Cir. 2011). There, the defendant first registered the domain name "gopets.com" in his name. *Id.* at 1027. After failed

16

negotiation attempts to sell the domain name to the plaintiff, GoPets, Ltd., the defendant transferred the registration of gopets.com from himself to a corporation he owned with his brother. *Id.* at 1027–28.

In reaching its decision, the Ninth Circuit first noted that the ACPA does not define the term "registration" and that "under any reasonable definition, the initial contract with the registrar constitutes a 'registration.'" *Id.* at 1030. However, the court continued:

> It is less obvious which later actions, if any, are also "registrations." [For example,] [a]fter registering . . . the registrant can update the registration if her contact or billing information changes. She can switch to "private" registration, where a third party's name is substituted for hers in the public databases of domain registrants. She can switch between registrars, but leave her contact and billing information unchanged. A registrant can change the name of the registrant without changing who pays for the domain, or a registrant can transfer both the domain and payment responsibilities to someone else. Even if the registrant does none of these things, she must still renew the registration periodically. All of these actions could conceivably be described as "registrations" within the meaning of § 1125(d)(1).

*Id.* at 1030–31. The Ninth Circuit concluded that the defendant was not a cybersquatter, given the minor, nominal change in ownership, because the defendant effectively controlled the subject website both before and after the change in the registration. *Id.* The court reasoned that the domain name holder has the right to transfer the domain to another owner because "[t]he general rule is that a property owner may sell all of the rights he holds in property." *Id.* at 1032. Thus, because including subsequent re-registrations within the meaning of "registration" would make domain names "effectively inalienable," the Ninth

17

Circuit held that the term registration, as used in the ACPA, "refer[s] only to the initial registration." *Id.* at 1031–32.

In cases involving statutory interpretation, we "begin our analysis with the text of the governing statute." *Snyder's-Lance, Inc. v. Frito-Lay N. Am., Inc.*, 991 F.3d 512, 516 (4th Cir. 2021). "Only when statutory text is ambiguous do we consider other indicia of congressional intent such as the legislative history." *Id.* Here, the ACPA does not define the term "register." Thus, "we give the term its ordinary, everyday meaning." *United States v. Mills*, 850 F.3d 693, 697 (4th Cir. 2017).

The Merriam-Webster Dictionary defines "registration" as "the act of registering." *Registration*, Merriam-Webster Dictionary (11th ed. 2022). To "re-register" simply means "to register again." *Re-register*, Merriam-Webster Dictionary (11th ed. 2022). Therefore, the ordinary meaning of the word "registers" necessarily includes both the first registration and any subsequent re-registrations. And because the ACPA does not expressly limit the term registers to only the initial or creation registration, we conclude that the re-registration of a domain name is a registration for purposes of the ACPA.

SSN places considerable reliance on the Ninth Circuit's *GoPets* decision to support its argument that ACPA liability based on a "re-registration" is improper because "[n]othing in the text or structure of the statute indicates that Congress intended that rights in domain names should be inalienable." Appellant's Opening Br. at 20 (quoting *GoPets*, 657 F.3d at 1032). But we find SSN's reliance on *GoPets* unavailing for a number of reasons.

18

To begin, the Ninth Circuit's *GoPets* decision is contrary to the statutory purpose of the ACPA, which is to curtail cyberpirates and cybersquatting. H.R. Rep. No. 106–464, at 108 (1999). Courts must interpret a given statute in accord with Congress's purposes and intent in enacting it. *See, e.g., United States v. Torrez*, 869 F.3d 291, 316–17 (4th Cir. 2017). And Congress's express intent in enacting the ACPA was to curtail abusive bad faith registrations that harm commerce, business, and consumers. *See* S. Rep. No. 106-140, at 4–6 (1999) (stating that online consumers have a difficult time distinguishing between authentic sites and pirate sites, which can result in brand abuse and consumer confusion); H.R. Rep. No. 106-412, at 6–7 (1999) (explaining that cyberpiracy harms businesses by causing loss of business opportunities by diverting customers from a trademark owner's website, blurring the distinctive quality of the domain name or tarnishing the domain name, and by requiring businesses to police and enforce their trademarks rights). By including the opportunity to pursue an in rem cause of action within the ACPA, Congress considered domain name holders to have a property-like interest in their domain names.

Because property interests are generally freely alienable, the Ninth Circuit declined to read the term "registration" to include re-registrations because such an interpretation could frustrate the alienability of domain names. *GoPets*, 657 F.3d at 1032. While this concern is well-taken, it would be "nonsensical" to *not* include re-registrations within the purview of the ACPA as it would allow for "the exact behavior that Congress sought to prevent." *Jysk*, 810 F.3d at 778. For example, if the ACPA were limited to initial registrations, a mark owner would not have a cause of action where, following the

19

withdrawal of a partner who was the initial registrant of a domain name, the departing partner is instructed by the remaining partners to re-register the domain name in the partnership's name but, in an attempt to extort the partnership, does not. *Cf. Xereas v. Heiss*, 933 F. Supp. 2d 1, 17 (D.D.C. 2013) (holding that plaintiff successfully stated a claim for cybersquatting pursuant to the ACPA against the defendant corporation by alleging that the company revised a domain name's registration information without permission after removing plaintiff, the original domain name registrant and mark owner, from his management role). Therefore, because of the unique nature of the domain name system, the term "registers" and its derivatives must encompass both initial registrations and re-registrations.

Additionally, we agree with the district court that "[t]he underlying rationale for the Ninth Circuit's decision—a public policy concern that innocent persons would be subject to ACPA liability for minor, periodic re-registrations of domain names—is best addressed through the bad faith intent to profit inquiry." *Prudential Ins. Co. of Am. v. PRU.COM*, 546 F. Supp. 3d 476, 492 (E.D. Va. 2021). As the Ninth Circuit correctly noted, registration, in the domain name context, may include a multitude of actions, including where a domain name holder switches between registrars, changes the name of the registrant or transfers both the domain and payment responsibilities to someone else. *GoPets*, 657 F.3d at 1030–31. However, a registrant will only lose their rights to a domain name at one of the aforementioned junctures if they act in bad faith. Cybersquatting is, by definition, a *bad faith registration* of another's trademark in a domain name. *Jysk*, 810 F.3d at 775 ("Cybersquatting is essentially extortion."). When a person re-registers a

domain name because of a periodic re-registration requirement, they do not act with a bad faith intent to profit. The ACPA does not take away the initial registrant's right to sell or transfer all of her rights in a domain name to any other party. Rather, the statute simply prohibits a domain name registrant from registering a domain name with a bad faith intent to profit. Thus, where there is no bad faith, there is no liability for cybersquatting.

Accordingly, we join the Third and Eleventh Circuits in holding that the term "registers" and its derivatives extend to each registration of a domain name, including the initial registration and any subsequent re-registrations. Where a successive registration of a disputed domain name postdates the trademark registration of the corresponding mark, the mark owner may show that the successive registration was done in bad faith. This interpretation furthers the ACPA's purpose of eliminating cybersquatting and protecting American businesses, consumers, and online commerce.

D.

Bad Faith

We now turn to the merits of Prudential's underlying ACPA claim. To prevail on a cybersquatting claim, a plaintiff must show that (1) the party using the domain name "had a bad faith intent to profit from using the . . .domain name"; and (2) the domain name "is identical or confusingly similar to, or dilutive of [a] distinctive and famous . . . [m]ark." *Newport News Holdings Corp. v. Virtual City Vinson, Inc.*, 650 F.3d 423, 434 (4th Cir. 2011). Cybersquatting claims may be decided on summary judgment where there are no genuine disputes of material fact. *Id.* at 434–35 (determining the issue of bad faith on summary judgment); *see also Lamparello v. Falwell*, 420 F.3d 309, 322 (4th Cir. 2005)

(same); *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001) (same).

Here, there is no dispute that PRU.COM is confusingly similar to Prudential's trademarked PRU because the parties agree that the domain name PRU.COM is identical to the trademarked term PRU. Thus, the sole and dispositive issue on summary judgment is whether SSN had a bad faith intent to profit from using the PRU.COM domain name. Subsection B of the ACPA's cybersquatting provision provides nine non-exclusive factors a court "may consider" when determining bad faith:

> (1) the trademark or other intellectual property rights of the [alleged cybersquatter], if any, in the domain name;
>
> (2) the extent to which the domain name consists of the legal name of the [alleged cybersquatter] or a name that is otherwise commonly used to identify [the alleged cybersquatter];
>
> (3) the [alleged cybersquatter's] prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (4) the [alleged cybersquatter's] bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (5) the [alleged cybersquatter's] intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (6) the [alleged cybersquatter's] offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or

having an intent to use, the domain name in the bona fide
offering of any goods or services, or the [alleged
cybersquatter's] prior conduct indicating a pattern of such
conduct;

(7) the [alleged cybersquatter's] provision of material and
misleading false contact information when applying for the
registration of the domain name, the [alleged
cybersquatter's] intentional failure to maintain accurate
contact information, or the [alleged cybersquatter's] prior
conduct indicating a pattern of such conduct;

(8) the [alleged cybersquatter's] registration or acquisition of
multiple domain names which the [alleged cybersquatter]
knows are identical or confusingly similar to marks of
others that are distinctive at the time of the registration of
such domain names, or dilutive of famous marks of others
that are famous at the time of registration of such domain
names, without regard to the goods or services of the
parties; and

(9) the extent to which the mark incorporated in the [alleged
cybersquatter's] domain name registration is or is not
distinctive and famous within the meaning of [15 U.S.C.
§ 1125(c)(1)].

15 U.S.C. § 1125(d)(1)(B)(i).  None of the factors is individually dispositive, and they

should not be added up against one another (i.e., a party "winning" five factors does not

win the argument per se).  *Lamparello*, 420 F.3d at 320 ("[T]here is no simple formula for

evaluating and weighing these factors.").  Instead, "[t]he ACPA allows a court to view the

totality of the circumstances in making the bad faith determination."  *Virtual Works*, 238

F.3d at 270.

Below, the district court found that all nine factors pointed to the conclusion that

SSN purchased and registered the PRU.COM domain name in bad faith with the intent to

profit.  Although a court need not "march through the nine factors seriatim," *Virtual Works*, 238 F.3d at 269, we do so here for completeness.

### 1.

### Factor One: SSN Has No Trademark or Intellectual Property Rights in PRU.COM

The first factor strongly favors Prudential.  Neither SSN nor Zhang had a trademark or intellectual property right in the domain name at the time of the registration.  The record is also clear that neither SSN nor Zhang had any legal right in the term PRU.  The mere fact that SSN owned the PRU.COM domain name is irrelevant because if registration of a domain name itself established a qualifying right, then factor one would favor the cybersquatter in every case.

### 2.

### Factor Two: SSN is Not Known as PRU

The second factor also strongly favors Prudential because SSN is not legally registered or commonly known as PRU.

### 3.

### Factor Three: SSN Has Not Previously Used PRU.COM for Any Bona Fide Commercial Offering of Goods or Services

The third factor also favors Prudential because SSN has failed to present any evidence demonstrating that it used PRU.COM for any bona fide commercial offering of goods or services.  The plain language of the statute indicates that only "prior use" of a domain name is relevant to the bad faith inquiry.  15 U.S.C. § 1125(d)(1)(B)(i)(III).  As we have previously recognized, "Congress did not list the proposed future use of a domain

name as a factor, presumably because it would be too easy for cybersquatters to claim an intent to use a disputed name to provide goods or services in the future." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 234 (4th Cir. 2002). While "there are cases in which a person registers a name in anticipation of a business venture that simply never pans out," a registrant's proposed future use of a domain name should be disregarded unless the registrant has a "longstanding history of using a trademark to provide goods and services" and "legitimate plans to offer such goods and services online in the future." *Id.* at 235 (alterations and internal quotation marks omitted).

Here, it is undisputed that since SSN's acquisition of the PRU.COM domain in 2017, the website only resolved to a GoDaddy parked page. Citing to several lower court decisions which determined that pay-per-click advertising was not a bona fide commercial use, the district court concluded that a GoDaddy parked page did not constitute a bona fide commercial offering of goods or services. *Prudential Ins. Co. of Am.*, 546 F. Supp. 3d at 486 (first citing *Puretalk Holdings, Inc. v. Puretalk.com*, No. 1:19-cv-1532, 2020 WL 6922651, at *4 (E.D. Va. Sept. 18, 2020) (pay-per-click advertising is not bona fide commercial use); and then citing *Opt Out Serv., LLC v. optoutprescreened.com*, No. 1:19-cv-6076, 2019 WL 7340748, at *3 (E.D. Va. Oct. 4, 2019) (same)).

SSN does not challenge the district court's conclusion that pay-per-click advertising is not a bona fide commercial offering of goods or services. Instead, SSN argues that the plain language of factor three makes clear that it is not the "offering of" goods and services via the website but the "use in connection with" such an offering that must be "prior." Appellant's Reply Br. at 22. Accordingly, SSN claims that its work to develop and prepare

the PRU.COM website for future business is a prior use of the website in connection with

SSN's anticipated offering of services.

To support this claim, SSN offered several documents that allegedly showcase

SSN's efforts to develop the PRU.COM domain name for launch on March 30, 2020.

These documents include: (1) a purported three-page contract between SSN and a Chinese

company, Wuhan Hezhou Network Technology Co. Ltd., to develop videos for

PRU.COM[9]; (2) a receipt indicating that SSN bought virtual server coverage  for the

PRU.COM domain name; (3) a purported one-page advertisement for the PRU.COM

domain name[10]; (4) a purported mock-up of the PRU.COM website dated March 30,

---

[9]   The purported contract appears to be a copy and not the original.  It is unclear whether the original contract was written in English, Chinese, or both.  SSN has provided no evidence authenticating this purported contract.  For example, the contract contains provisions relating to payment for the alleged video dubbing performed by Wuhan Hezhou. However, SSN has not submitted the actual videos or any record of a payment made to Wuhan Hezhou for those services.

[10] The screenshot of the purported advertisement is dated April 19, 2020, and was posted on SSN's website, fx110.com.  SSN claimed the advertisement was posted on March 2, 2020, but no evidence establishes that the advertisement was created and posted before this dispute arose.  Moreover, the purported advertisement is for "Prune, the master," the meaning of which has not been explained at any point in this litigation.  J.A. 638.

2020[11]; and (5) three pages of thumbnail sketches of financial symbols and cartoon characters, which SSN claims represent proof of the videos to be uploaded to PRU.COM.[12]

Although these materials may offer some support[13] for SSN's argument that it was preparing to launch PRU.COM, none of these documents negate the fact that, while registered to SSN, the disputed domain had no identifiable purpose other than as a landing page for advertisements. It is undisputed that SSN never uploaded any of the aforementioned materials to PRU.COM in a manner accessible to the public.

Moreover, the record is devoid of any evidence that SSN had a "longstanding history of using [PRU] to provide goods and services." *Harrods*, 302 F.3d at 235. SSN asserts that the Chinese name for its alleged financial news product is 普鲁社 and that 普鲁社 is Simplified Chinese for Pǔ Lǔ Shè, which means Prussian "news agency" or

---

[11] The record suggests that this mock-up is internal, as the IP address that allowed access to this mockup was not created until March 31, 2020, after Prudential initiated the UDRP action.

[12] Below, SSN claimed that the 20 video tutorials depicted in the screenshot were first launched online March 2, 2020. However, below the thumbnail sketches is a "Notice of Non-Affiliation" stating, "pru.com is not affiliated, associated, authorized, or endorsed by or in any way officially connected with The Prudential Insurance Company of America or any of its subsidiaries or affiliates." J.A. 606. If these tutorials were, in fact, launched online on March 2, 2020, then this statement directly contradicts SSN's claims that it did not have knowledge of Prudential or Prudential's trademarks prior to Prudential filing its UDRP action on March 25, 2020.

[13] These materials were authenticated through the declaration of SSN's counsel, who lacks personal knowledge of the substance of the documents and the date of creation. *See Bias v. Moynihan*, 508 F.3d 1212, 1224–25 (9th Cir. 2007) (explaining that a witness with personal knowledge, not counsel, should typically authenticate documents).

27

"organization" in English.  J.A. 384.  SSN also asserts that the short form for Pǔ Lǔ Shè is

"P," "R," "U," and thus 普魯社, or "PRU," is an appropriate name for its proposed forex

news product.   Besides its claim that an "easy-to-remember domain name was critical to

the success of its product," J.A. 396, SSN has not proffered any reasonable explanation for

acquiring the PRU.COM domain name.  There is nothing special about the name "Prussian

News Organization" that would lead consumers to believe they were interacting with an

SSN product or that they would find forex news on such a site.  Thus, while SSN passively

held onto the domain name -- simultaneously preventing others from making use of it --

SSN never actively used PRU.COM in connection with any offer of goods or services.  As

the Sixth Circuit explained:

> It is irrelevant that [the alleged cybersquatter] states that he
> intends to add bona fide goods or services to the site eventually
> since . . . factor [three] asks whether the domain name holder
> has actually used the site in connection with the offer of goods
> or services, not whether the domain holder intends to do so.

*DaimlerChrysler v. Net Inc.*, 388 F.3d 201, 207 n.3 (6th Cir. 2004).

4.

<u>Factor Four: SSN Has Not Previously Used PRU.COM for Any Non-Commercial or Fair</u>
<u>Use Purpose</u>

The fourth factor also strongly favors Prudential because it is undisputed that SSN

has never used PRU.COM for any non-commercial or fair use purpose.

5.

<u>Factor Five: SSN's Intent in Registering PRU.COM was to Divert Customers Away from
Prudential</u>

Factor five "is rarely discernable directly" and "must typically be inferred from the
pertinent facts and circumstances.'" *Audi AG v. D'Amato*, 469 F.3d 534, 549 (6th Cir.
2006).  Here, we conclude that the fifth factor favors Prudential for three reasons.

First, PRU.COM is identical to Prudential's PRU mark, which itself provides a basis
from which a court can infer SSN intended to divert consumers away from Prudential.  *See
DaimlerChrysler*, 388 F.3d at 207 (concluding that an intent to divert can be inferred from
the use of a domain name that is phonetically identical to the mark owner's trademark).
Second, SSN lacks any meaningful or persuasive explanation for acquiring PRU.COM.  As
discussed above, besides its claim that it wanted an easy to remember domain name, SSN
failed to offer any explanation for why PRU.COM is an appropriate name for the
company's alleged forex news product.  Per SSN's reasoning, any three-letter domain
name would have worked because three-letter names are "easy-to-remember."  J.A. 396.
If there is some reason why the term "PRU" or "Prussia" would lead Chinese consumers
to believe that a product branded as such would have some relation to the forex market,
SSN has not provided it.  *See Domain Name Clearing Co. v. F.C.F., Inc.*, 16 F. App'x 108,
110 (4th Cir. 2001) (per curiam) (emphasizing that the alleged cybersquatter "did not offer
any evidence of why it selected [the domain] name or what it intended to do with [it]").

Third, SSN permitted PRU.COM to resolve to a GoDaddy parked page, which
displayed advertisements for Prudential's competitors.  SSN claims that it "had no control

over what was in the hyperlinks," which "were created entirely by GoDaddy, Inc. to provide income to GoDaddy, without any benefit whatsoever to [SSN]." Appellant's Reply Br. at 20. SSN also maintains that it did not know about the advertisements because the Chinese version of PRU.COM resolved to a GoDaddy parked page without advertisements.[14] But the facts belie this claim. SSN began purchasing domain names in 2009 and has been a GoDaddy customer since March 20, 2012. To date, SSN has over 100 domain names in its GoDaddy account and has presumably completed a Registration Agreement for each. So, while it is true that GoDaddy selected all "in-house and third-party advertising," per the registration agreement, SSN was aware that: (1) a parked page was the default setting; (2) a parked page would display advertisements; and (3) SSN could choose, at any time, whether PRU.COM would resolve to a parked page or another website. Thus, SSN had the power to direct PRU.COM away from the GoDaddy parked page but chose not to.

SSN also maintains that it did not know that the "American companies named in the hyperlinks included [Prudential's] competitors" but, tellingly, does not cite to any evidence beyond Zhang's declaration to support this argument. Appellant's Reply Br. at 20 (citing

---

[14] The evidence SSN relies upon for its assertion that the Chinese version of PRU.COM resolved to a GoDaddy parked page without advertisements is a screenshot of what the PRU.COM website looked like when Zhang was logged in to his GoDaddy account. SSN has not explained or provided any evidence demonstrating how the exact same domain name could lead visitors to two different landing pages, given that ".com" domain names can be used anywhere in the world.

J.A. 834). "[A]bsent objective corroboration," a self-serving opinion cannot defeat summary judgment, *Williams v. Giant Food, Inc.*, 370 F.3d 423, 433 (4th Cir. 2004), and a nonmovant cannot create a genuine dispute of material fact by relying on "conclusory allegations or bare denials," *Erwin v. United States*, 591 F.3d 313, 319 (4th Cir. 2010). Accordingly, it can be readily inferred from the undisputed circumstantial evidence that SSN intended to divert consumers away from Prudential.

6.

Factor Six: SSN's Offers to Sell PRU.COM

Although it is ultimately inconsequential to the disposition of this case, we conclude that the district court erred in determining that the sixth factor "clearly favor[ed] Prudential." *Prudential Ins. Co. of Am.*, 546 F. Supp. 3d at 490. "[A] mere offer to sell a domain name is not itself evidence of unlawful trafficking." *Virtual Works*, 238 F.3d at 270. However, there is no requirement under factor six that the cybersquatter make a formal offer to sell the domain name. *See E. & J. Gallo Winery v. Spider Webs Ltd.,* 286 F.3d 270, 276 (5th Cir. 2002) ("Many cybersquatters are now careful to no longer offer the domain name for sale in any matter that could implicate liability.").

Here, the record includes a screenshot of the United States version of the PRU.COM domain name as it appeared when registered to SSN. At the time, the phrase "Would you like to buy this domain name?" appeared on the site next to a box that read "Learn More." J.A. 166. However, it is unclear whether *all* GoDaddy parked pages automatically included the statement "Would you like to buy this domain name?" or whether this feature was something SSN had to opt into. It is also unclear what exactly a visitor to the site would

31

find were she to "click" on the "Learn More" box.  It could be that the link took visitors to a page that indicated that the domain name was, in fact, not for sale.  Thus, whether this statement alone could be considered an "offer to transfer, sell, or otherwise assign the domain name" is in dispute.  15 U.S.C. § 1125(d)(1)(B)(i)(VI).

Moreover, the record establishes that on or around March 18, 2020, SSN engaged in negotiations with Prudential's investigator via a GoDaddy intermediary about the possible sale of the PRU.COM domain name.  Refusing to communicate with GoDaddy brokers via email, someone at SSN (it is unclear who) instead spoke directly with a GoDaddy representative over the phone.  The GoDaddy representative indicated in an email sent to other GoDaddy officials that SSN had rejected a five-figure offer from the anonymous buyer (later identified as Prudential), claiming that it had received a six-figure offer in the past from Sedo.com, and indicated that it would give a price only after the interested buyer disclosed what type of business it was in.  However, Zhang claims that SSN "rejected both offers because [SSN] had no intention of selling the domain name, preferring to use it for . . . services in China," not because it wanted to secure a six-figure sum.  J.A. 115.  SSN also contends that it "never listed nor offered to sell . . . the domain name to any party."  *Id.* at 387.  Therefore, there is a genuine dispute of fact concerning whether SSN actually offered to sell the PRU.COM domain name for a six-figure sum or only rejected offers to buy it.

7.

<u>Factor Seven: SSN's Use of False or Misleading Contact Information When Registering or Maintaining PRU.COM</u>

The "provision of false contact information to a registrar is a hallmark of the cybersquatter, who wants to profit without being easily identifiable and served with process."  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25A:60 (5th ed. 2019).  But a "mere honest mistake in identification has no such import." *Id.*

In its briefing, SSN does not address the district court's conclusion as to factor seven beyond its bare assertion that it "did not use false or misleading information when registering and maintaining the domain."  Appellant's Reply Br. at 22; *see also* Appellant's Opening Br. at 28.  Nonetheless, the WIPO records establish that Zhang listed Bailun as the registrant organization for the PRU.COM domain name, not SSN, the company for whom Zhang claims he purchased the disputed domain name.  At the time Zhang filed his motion to dismiss, it was not clear who "the registrant of the Domain Name" was, but the district court noted, "defendant's counsel represented that Zhang registered the Domain Name at the behest of his employer, Shenzhen Stone."  *Prudential Ins. Co. of Am.*, 2020 WL 4208447, at *6.  However, SSN failed to file an answer on behalf of the subject res, PRU.COM, even after the district court denied Zhang's motion to dismiss.  It was not discovered until Zhang's deposition on March 18, 2021 that Zhang actually owns and controls both SSN and Bailun, operates them as one entity, and is the one who decides to

purchase and register domain names.  Thus, listing Bailun as the registrant organization instead of SSN was false and misleading.

Additionally, SSN changed the contact information for its GoDaddy account associated with PRU.COM twice after Prudential filed its initial UDRP action -- once on March 30, 2020, and again on April 9, 2020.  It is undisputed that from 2017 until March 27, 2020, SSN used a proxy service to hide its registrant contact information for PRU.COM.  However, the proxy service was terminated, per WIPO's policy,[15] when Prudential filed a UDRP complaint.  The WIPO case administrator provided Prudential with the disputed domain name's registrant information on March 27, 2020.  On March 30, 2020, Zhang changed the registrant's name from "shi wan" to "zhaoyuan."  "Wan shi" is Chinese for "stone" and "Shenzhen Stone" is also known as "Shenzhen Wanshi."  Then, on April 9, 2020, Zhang changed the registrant's last name to "zhang," resulting in

---

[15] WIPO's policy provides the following:

> In order to give effect to the UDRP, providers have a reasonable and legitimate purpose to relay registrar-provided WhoIs data to complainants in pending UDRP proceedings so as to provide an opportunity for complainants to make substantive and/or procedural amendments as appropriate (an accepted practice today concerning privacy/proxy services named as respondents).

*Impact of Changes to Availability of WhoIs Data on the UDRP*, WIPO, https://www.wipo.int/amc/en/domains/gdpr/ (choose "Will WIPO Provide the Registrar-Confirmed WhoIs Data to UDRP Complainants?" from dropdown) (last visited Jan. 4, 2023) (saved as ECF opinion attachment).

"zhaoyuan zhang." Thus, Zhang changed the registrant's name from a name identifying SSN as the registrant to his own name.

SSN does not dispute that these changes were made, but Zhang states in his August 31, 2020 sworn declaration, "Notably, my name is listed as the 'Full Name' of the account holder." J.A. 1053. This statement is misleading at best given that Zhang made multiple changes to the registrant GoDaddy account *after* receiving notice of the UDRP complaint.

SSN's initial concealment of both Zhang's and SSN's names, coupled with Zhang's later modification of the GoDaddy contact information, suggests an intent to conceal SSN's true identity. Thus, factor seven favors Prudential and a finding of bad faith.

8.

Factor Eight: SSN's Registration of Other Domain Names

The eighth factor likewise favors Prudential because SSN has registered over 100 domain names, including domain names that match the registered marks of others, like "yelp," "quora," and "chrome." As the district court noted, "It is widely known that Yelp is a popular restaurant review service, that Quora is a popular internet question-and-answer service, and that Chrome is the popular web browser built by Google." *Prudential Ins. Co. of Am.*, 546 F. Supp. 3d at 491. SSN's decision to register these domain names as well as 100 others evinces a desire to squat on domain names rather than use them. *See Harrods*, 302 F.3d at 239 n.13 (emphasizing that factor eight favors the mark owner where the alleged cybersquatter has "registered hundreds of [unrelated] domain names, such as names

35

incorporating marks like Bloomingdale's or Saks Fifth Avenue"). Accordingly, factor eight favors a finding of bad faith.

9.

<u>Factor Nine: Prudential's PRU and PRU-Formative Marks are Distinctive and Famous</u>

Finally, the ninth factor also favors Prudential because Prudential has long held a trademark in the term "PRU," both domestically and abroad. A mark is famous if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). In determining whether a mark is famous, a court may consider all relevant factors including the: (1) duration, extent, and geographic extent of advertising and publicity of the mark; (2) amount, volume, and geographic extent of sales of goods or services offered under the mark; and (3) extent of actual recognition of the mark. *Id.* The registration of a distinctive mark may itself satisfy factor nine. *Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535, 542 (4th Cir. 2002) (Because a generic mark cannot be registered, "the fact that a mark is registered is strong evidence that the mark satisfies the statutory requirements for the distinctiveness necessary for trademark protection."), *abrogated on other grounds by Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014).

Here, Prudential's products and services include investments and products involving foreign exchange hedging, foreign exchange contracts, and investment funds. Prudential has been using PRUDENTIAL, PRU, and PRU-formative marks, both in the United States and internationally (including in Taiwan where SSN claims to have an office), in connection with the promotion and advertisement of its products since at least

36

2001. In fact, Prudential's New York Stock Exchange ("NYSE") ticker symbol is "PRU" and has been since December 13, 2001.

SSN argues, "the district court erred by . . . confusing the foreign exchange market with the stock market." Appellant's Reply Br. at 16. We find this argument unavailing because the NYSE has a major influence upon the global economy and currency exchange rates. Forex and stocks are two of the most traded financial markets in the world, and there are often correlations between the two. SSN's forex data is also sourced from Bloomberg, an American company, and Reuters, a global news agency. Thus, "a leading company in the [forex] information industry in China" sourcing its data from an American financial institution should know about the NYSE. J.A. 396.

Prudential has been in business as PRUDENTIAL for over 145 years and has held a trademark in the term "PRU" in some countries as early as 1974. While it is true that Prudential plc, an unaffiliated company, uses the PRUDENTIAL and PRU trademarks in China, Prudential still does business in China through publicly disclosed joint venture arrangements with local partners and through its subsidiaries, including Everbright PGIM Fund Management Co., Ltd. and Pramerica Fuson. The use of Prudential's well-known logo, "THE ROCK," plainly links these entities back to Prudential.

Moreover, SSN does not use the PRU mark to advertise its organization, nor has it ever actively used PRU.COM. It is undisputed that while registered to SSN, PRU.COM resolved to a parked page accessible in the United States, where Prudential uses the PRU and PRU-formative marks. And SSN does not have any valid property rights in the PRU mark in *any* country, and thus, is not a legitimate concurrent user. *See Harrods*, 302 F.3d

at 233, 234 n.9 ("The use of an identical mark by two different companies is sometimes allowed in trademark law under the concept of 'concurrent use.'").  Accordingly, it is clear that the PRU mark enjoys widespread recognition, particularly in the United States where SSN has chosen to register a number of different domain names with Verisign and GoDaddy.  Therefore, factor nine favors Prudential.

Accordingly, for the foregoing reasons, we agree with the district court's conclusion that SSN acted with the bad faith intent to profit from using the PRU.COM domain name.

E.

The ACPA's Safe Harbor

The ACPA contains a "safe harbor" provision that states, "bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).  Because the ACPA was designed to thwart cybersquatters, it does not extend to innocent domain name registrations by those who are unaware of another's use of the name.  H.R. Rep. No. 106–464, at 109 (1999).  However, as a matter of law, "[a] defendant who acts even partially in bad faith in registering a domain name is not . . . entitled to benefit from the [ACPA]'s safe harbor provision." *Virtual Works*, 238 F.3d at 270.  Thus, we construe the ACPA's safe harbor provision in a manner that does not "undermine the rest of statute" because "[a]ll but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior." *Id.*

Here, SSN failed to satisfy the statute's safe harbor provision. First, SSN's self-serving denials of subjective belief that its use of the PRU.COM domain name was lawful are insufficient to defeat summary judgment absent objective corroboration. *See Williams*, 370 F.3d at 432. The district court was not required to accept SSN's "bare denials" of its knowledge of Prudential's trademark, *Erwin*, 591 F.3d at 319, particularly where SSN admittedly formed a plan to submit trademark applications for PRU.COM in 2019 and, in fact, did submit such applications in New Zealand, Australia, the United Kingdom, and the United States in June 2020. And notably, at the bottom of the document SSN submitted as evidence of the purported tutorial videos it launched online at PRU.COM in early March 2020, there is a "Notice of Non-Affiliation" stating, "pru.com is not . . . in any way officially connected with [Prudential]." J.A. 606. This statement directly contradicts SSN's claims that it did not have knowledge of Prudential or Prudential's trademarks prior to March 2020. Because SSN failed to adduce sufficient evidence to defeat summary judgment on the subjective component of the ACPA's safe harbor, the district court properly concluded that the safe harbor did not apply.

Second, SSN did not have reasonable grounds to believe that its registration of the PRU.COM domain name was otherwise lawful. A company specializing in foreign exchange trading could not reasonably believe that a domain name identical to a stock ticker and a term trademarked in over 20 countries by a major financial services institution was lawful. SSN's purported ignorance of American businesses and trademarks is belied by uncontroverted evidence demonstrating that PRU.COM was accessible to consumers in the United States during the time it was registered to SSN, a majority of SSN's registered

domain names are in English, several of SSN's domain names include the names of popular American companies, and SSN attempted to obtain a trademark for "PRU" in the United States.

Pursuant to 15 U.S.C. § 1072, the "registration of a mark on the principal register . . . shall be constructive notice of the registrant's claim of ownership."  An entity that has registered several hundred domain names with the American company GoDaddy is subject to constructive notice of American trademarks given that the GoDaddy registration agreement requires registrants to confirm that the registration of a domain name does not interfere with another's intellectual property rights.  Thus, because SSN failed to establish the objective element of the ACPA's safe harbor, the district court did not err in rejecting the defense.  *See Domain Name Clearing Co.*, 16 F. App'x at 111 (concluding that cybersquatter had a bad faith intent to profit even where cybersquatter allegedly was not aware of the mark at the time of registration).

IV.

For the foregoing reasons, the district court's order granting summary judgment to Prudential is

*AFFIRMED.*